UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSALYN GRAHAM,<br><br>  Plaintiff,<br><br>  v.<br><br>CHRISTOPHER BLAIR, BRIAN ZYWICKI,<br>MIKE ORIGLIOSSO and DAVE MATEVEY,<br><br>  Defendants. | Case No. 10-cv-772-JPG-PMF |
| KATHY WILLIAMS,<br><br>  Plaintiff,<br><br>  v.<br><br>CHRISTOPHER BLAIR, BRIAN ZYWICKI,<br>MIKE ORIGLIOSSO and DAVE MATEVEY,<br><br>  Defendants. | Case No. 10-cv-780-JPG-PMF |

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendants Christopher Blair, Brian Zywicki, Mike Origliosso and Dave Matevey (Doc. 16). Plaintiffs Rosalyn Graham and Kathy Williams have responded to the motion (Doc. 19).

**I. Standard for Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences

in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.    Facts

Viewing all the evidence and drawing all reasonable inferences in the plaintiffs' favor, the Court finds the admissible evidence establishes the following relevant facts.

In August 2009, while Graham was living in East St. Louis, Illinois, Graham called 911 to report an incident of harassment at her home, but no police officer ever responded to her call. She later reported the identity of the harasser to someone at the East St. Louis Police Department, but the police did not do anything to prevent the harasser from coming to her house again the next day. Graham began to believe the police department was not going to help her, so

she decided to purchase a gun for her own self-defense.

    A.    <u>August 13, 2009</u>

On August 13, 2009, Graham went to Ron and Jo's Gun Shop in O'Fallon, Illinois, to purchase a gun. She brought along with her Richard "Cotton" Allen, her husband from whom she was separated, her brother Anthony Neal, and Neal's girlfriend Kim Scott. Allen was a convicted felon and was not permitted to own or carry a handgun. While Graham was looking at handguns in Ron and Jo's, Allen, Neal and Scott went into another room to look at the "big guns." Graham decided to purchase a handgun that the salesman had shown her, presented her firearm owner's identification ("FOID") card, filled out the required paperwork and then left the store to wait the mandatory waiting period before she could pick up the gun.

Defendant Dave Matevey, an O'Fallon, Illinois, police officer, saw Graham leaving the parking lot. About a half mile from Ron and Jo's, Matevey pulled Graham over for having a low-hanging muffler, but Graham's car had no muffler. When he approached her, she told Matevey she had a FOID card and had purchased a gun legally. She continued to explain why she and Allen had been at Ron and Jo's, which raised Matevey's suspicions because he had not questioned her gun purchase. Matevey ended up writing Graham a ticket for not having an insurance card with her while she was driving. Matevey recognized Allen, who Matevey knew was a convicted felon, in the front passenger seat of Graham's car.

Later, another O'Fallon police officer told Matevey that the Ron and Jo's salesman from whom Graham had purchased the gun had told him that Allen had been very interested in which gun Graham was considering and appeared to be directing her purchase. Based on Graham's behavior when he had pulled her over and on this report from the other O'Fallon police officer, Matevey came to believe Graham was purchasing a gun for Allen and informed the entire

3

O'Fallon Police Department of his suspicion. The United States Department of Justice Bureau of Alcohol, Tobacco and Firearms ("ATF") learned of Matevey's suspicions, and ATF Special Agent Stephen Kirkpatrick began an investigation. Matevey believed Kirkpatrick had been informed of what Matevey had learned about Graham's gun purchase.

B. August 18, 2009

ATF asked the O'Fallon Police Department to assist in a sting operation involving Graham's gun purchase by stopping Graham's vehicle after she picked up the gun from Ron and Jo's. Law enforcement viewed the traffic stop as high risk. O'Fallon Police Department Sergeant James Cavins contacted defendant Origliosso, then a sergeant with the Fairview Heights Police Department, to ask the Fairview Heights Police Department to assist in the traffic stop if Graham drove towards Fairview Heights. Origliosso indicated the Fairview Heights Police Department would help. Kirkpatrick was in charge of the sting operation.

In the afternoon of August 18, 2009, Graham went to Ron and Jo's to pick up the gun she had purchased a few days earlier. She took with her Allen, plaintiff Williams and Williams' three-year-old son. Graham intended to drop Allen off at his mother's house before going to Ron and Jo's, but because it was easier logistically to pick up the gun and then drop Allen off, she changed her mind and went to Ron and Jo's while Allen was still in her car. Graham picked up the gun, made sure the safety was on, placed the gun in the trunk of her car and drove away.

ATF agents notified Matevey that Graham had picked up the gun and that Allen was with her in the car. The agents described Graham's vehicle, indicated it was heading west towards Fairview Heights, and asked Matevey to stop the car. Matevey and Cavins, who was in the car with Matevey, turned on their lights and siren and attempted to stop Graham's vehicle. Graham passed into Fairview Heights, where defendants Blair and Zywicki, Fairview Heights police

4

officers, joined the pursuit of Graham's vehicle in their respective vehicles.

When Graham noticed lots of police cars following her with their sirens on, she pulled into a parking lot. By the time Graham stopped, there were a number of O'Fallon and Fairview Heights police officers on the scene, including Matevey, Blair and Zywicki. Origliosso parked his car on the street and provided cover for the arresting officers.

Law enforcement officers with guns drawn told everyone to get out of the car and put their hands up. Graham and Williams[1] complied with all commands; when they were asked, they laid on the ground and allowed an unidentified officer to place handcuffs on them without any resistance. This was very embarrassing for them. During an inventory search of Graham's car by ATF agents, the agents located Graham's newly purchased gun in the trunk and confiscated it. Neither the O'Fallon nor the Fairview Heights Police Departments ever had possession of Graham's gun.

The roles of the defendants during the stop were limited:

- Matevey was present during the stop but did not say anything to Graham or have any physical contact with her during the arrest. Graham did not say anything to Matevey either. Matevey did not participate in transporting Graham to the police station or in any activity once she got there. At the scene of the stop, Williams and her son were put into Matevey's patrol car and, at the request of ATF agents, Matevey transported them to the O'Fallon Police Department and placed them in an interview room. Matevey did not talk to Williams during the trip and had no further contact with Williams after that. He did not know that Williams had urinated on herself.

---

[1] The Court omits evidence relating to Allen, which is irrelevant since he is not a party to this case.

- Neither Blair nor Zywicki issued any commands to or had any physical contact with Graham or Williams.

- Blair assisted an O'Fallon police officer in making sure there were no other occupants of the vehicle, and then Blair returned to his vehicle. Neither Graham nor Williams ever spoke to Blair.

- When an O'Fallon police officer asked Zywicki if he could put one of the plaintiffs (it is unclear which one) in his squad car, Zywicki said yes but did not participate in putting the subject in his car and did not have any physical contact with her. While she was in the car, she asked Zywicki what was going on, but Zywicki told her she would have to ask an O'Fallon police officer. This was the only verbal interaction Zywicki had with either plaintiff. When the scene was secure, the O'Fallon officer removed the subject from Zywicki's car and put her in an O'Fallon police vehicle.

- Origliosso returned to his vehicle after Graham and Williams were taken into custody. He had no physical contact with either plaintiff during the incident, and neither plaintiff ever spoke to Origliosso.

At the O'Fallon police station, Graham and Williams were detained and interviewed by ATF agents for several hours.[2] Neither they nor Williams' son was mistreated at any time. Neither Graham nor Williams was charged with any crime or written a ticket for any infraction,

---

[2] The defendants have submitted DVDs of the interviews of Graham and Williams but have not pointed to any specific part of the interviews or explained how those parts establish any relevant point. It is not the Court's function to "scour the record" in search of evidence to support or oppose a motion for summary judgment. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Because the defendants have not directed the Court to specific evidence or explained the significance of that evidence, the Court has disregarded the DVDs in determining whether a genuine issue of material fact exists for trial.

and Kirkpatrick ordered that they could be released at the end of their interviews. No Fairview Heights police officer was at the O'Fallon police station at any relevant time.

    C.    <u>August 20, 2009</u>

Two days later, an ATF agent called Graham to tell her he was returning her gun to Ron and Jo's. He met Graham there and returned the gun, and Ron and Jo's returned Graham's money, minus a $10 restocking fee. None of the defendants forced Graham to return her gun to Ron and Jo's.

**III.    Procedural History**

In October 2010, Graham and Williams filed separate suits in this Court (No. 10-cv-772-JPG-PMF; No. 10-cv-780-JPG-PMF). Each alleges causes of action under 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free from unreasonable search and seizure, their Sixth Amendment right to be informed of the nature and cause of the accusations against them (both of which are made applicable to state and municipal actors by the Fourteenth Amendment due process clause) and their Fourteenth Amendment right to due process and equal protection of the laws. The Court consolidated Graham's and Williams' cases on December 13, 2010 (No. 10-cv-772-JPG-PMF, Doc. 11), and the defendants have filed a single motion for summary judgment seeking judgment on both plaintiffs' claims.

As a preliminary matter, some housekeeping is necessary. In their response to the defendants' summary judgment motion, the plaintiffs state that their Fourth Amendment claims have never included claims of excessive force, unreasonable searches or unreasonable seizure of property. However, because their complaints could be read to include such claims, the Court will construe the plaintiffs' response as a motion to dismiss such claims pursuant to Federal Rule of Civil Procedure 41(a)(2) and will grant the motion and dismiss those Fourth Amendment

7

claims without prejudice.

Additionally, in their response to the defendants' summary judgment motion, the plaintiffs concede that they have abandoned their Sixth Amendment claim, as was reflected in their answers to interrogatories. The Court also construes this as a motion to dismiss pursuant to Rule 41(a)(2) and will grant the motion and dismiss the plaintiffs' Sixth Amendment claims with prejudice. The Court makes this ruling on the merits because the plaintiffs had no Sixth Amendment right to be informed of the nature and cause of the accusations against them until the government committed itself to prosecuting them, which the plaintiffs do not claim in this case. *See Kladis v. Brezek*, 823 F.2d 1014, 1018 (7th Cir. 1987) ("Although the Sixth Amendment provides an 'accused' the right 'to be informed of the nature and cause of the accusation,' . . . the Sixth Amendment's protection does not come into play until the government has committed itself to prosecution.").

Finally, the defendants note that in response to their interrogatories about the plaintiffs' Fourteenth Amendment claims, the plaintiffs failed to identify any equal protection claim or any due process claim independent of their unreasonable arrest claims. The defendants noted this abandonment in their summary judgment motion, and the plaintiffs failed to respond to that argument. The Court construes this failure as an admission of the defendants' abandonment argument and will grant the defendants' motion as to the equal protection claims. The plaintiffs' due process claims are construed to be Fourth Amendment claims. *See Belcher v. Norton*, 497 F.3d 742, 754 (7th Cir. 2007) (holding that where actions fall within the ambit of the Fourth Amendment, the Fourth Amendment, as opposed to the due process clause of the Fourteenth Amendment, provides the appropriate analysis framework).

Having disposed of the foregoing claims, the Court notes that the only claims remaining

for adjudication are the plaintiffs' Fourth Amendment claims for unreasonable seizure of their person. Graham's Fourth Amendment claim is based on the August 13 and August 18 seizures; Williams' Fourth Amendment claim is based only on the August 18 seizure. The plaintiffs claim their arrests violate the Fourth Amendment because they were not supported by probable cause.

**IV.    Analysis**

The defendants ask for summary judgment with respect to the August 18 seizure on several grounds: (1) qualified immunity, (2) the existence of probable cause and (3) lack of personal involvement. The plaintiffs disagree.

   A.    Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). It applies only to state officials who occupy positions with discretionary or policymaking authority and who are acting in their official capacities. *Harlow*, 457 U.S. at 816; *Denius*, 209 F.3d at 950.

The qualified immunity test has two prongs: (1) whether the facts, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232; *see Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). "Qualified immunity, as applied in the context of an alleged unlawful

9

arrest, will shield a police officer from § 1983 liability if a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Tangwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir. 1998) (internal quotations omitted; brackets in original). The defendants argue that they, as line officers relying on ATF's and Kirkpatrick's leadership in the August 18 seizure, are shielded by qualified immunity because it would not have been clear to a reasonable line officer in their positions that executing the seizure would violate the plaintiffs' constitutional rights. The defendants rely on *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022 (9th Cir. 2002), *aff'd sub nom Groh v. Ramirez*, 540 U.S. 551 (2004), and *Hunt v. Tomplait*, 301 F. App'x 355 (5th Cir. 2008).

In *Ramirez*, the Ninth Circuit Court of Appeals held that line officers who execute search warrants obtained by others and who do not plan or lead the search are entitled to qualified immunity as long as they inquire as to the nature and scope of the warrant and do not know of the warrant's invalidity. *Ramirez*, 298 F.3d at 1028. If officers do not lead a search, they may "accept the word of their superiors that they have a warrant and that it is valid." *Id.* The *Hunt* court found that a leader of a search was not entitled to qualified immunity from a claim based on a search of the wrong house. *Hunt*, 301 F. App'x at 361-63. As a leader, the defendant was required to make reasonable efforts to verify that the residence searched was the residence at the address on the search warrant. *Id.* at 360-62. Because he failed to do so, he was not entitled to qualified immunity. *Id.* at 361-63. The plaintiffs claim *Ramirez* and *Hunt* are factually distinguishable from the case at bar, which did not involve executing a search warrant.

The defendants have essentially pointed to the "collective knowledge doctrine" in the search warrant context. "The collective knowledge doctrine permits an officer to stop, search, or

arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232-33 (1985)). "There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest – or the collective knowledge of the agency for which he works – is sufficient to constitute probable cause." *Williams*, 627 F.3d at 252. In a civil case for an arrest without probable cause, the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the arrest. *See Hardiman v. Ford*, 41 F.3d 1510, 1994 WL 585409, *4 (7th Cir. 1994) (Table). Thus, if there are no circumstances that would lead a reasonable officer in the defendant's position to believe the officer directing the seizure cannot be trusted to assess probable cause, the defendant can rely on the lead officer in good faith and be accorded qualified immunity for any unlawful arrest. *See id.*

In this case, there is no evidence indicating that the defendants' reliance on Kirkpatrick and other ATF agents to assess probable cause was objectively unreasonable or in bad faith. Kirkpatrick and other ATF agents were the leaders of the seizure operation and, like the search leaders in *Hunt*, had their own obligations to ensure probable cause for the arrests existed. Officers from the O'Fallon and Fairview Heights Police Departments had no reason to believe the ATF agents could not be trusted to make this decision correctly and, accordingly, relied in good faith on ATF agents' directions to participate in the arrest. Additionally, with respect to Matevey in particular, he had additional knowledge concerning his contact with Graham on August 13, 2009, that was consistent with, although likely not sufficient to support, probable cause. In sum, the defendants had no obligation to verify probable cause on their own and had

no reason to suspect it did not exist. Therefore, their reliance on Kirkpatrick and other ATF agents' directions to execute the seizure was objectively reasonable

Additionally, the plaintiffs have not pointed to any case in existence on August 18, 2009, from which the defendants should have believed that assisting a lead officer with an arrest without personally knowing or inquiring into probable cause where there was no basis to believe probable cause did not exist violated the arrestee's constitutional rights. On the contrary, the collective knowledge doctrine allowing them to rely on other officers was clearly established when the defendants participated in the plaintiffs' arrest. *See, e.g., United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005). For these reasons, the defendants are entitled to qualified immunity on the plaintiffs' Fourth Amendment claims concerning the August 18, 2009, seizure.

B.   Probable Cause and Personal Involvement

Because the Court has found that the defendants are entitled to qualified immunity from the plaintiffs' Fourth Amendment claims concerning the August 18, 2009, seizure, it need not address whether there was probable cause to actually make the arrests or whether each defendant was sufficiently personally involved in the arrest.

With respect to the August 13, 2009, traffic stop, it is clear that defendants Blair, Zywicki and Origliosso were not personally involved in that stop and cannot be held liable for any Fourth Amendment violation that resulted. Accordingly, the Court will grant summary judgment for them on that claim by Graham.

V.   **Conclusion**

For the foregoing reasons, the Court:

- **GRANTS** the defendants' motion for summary judgment (Doc. 16) on the basis of qualified immunity for the plaintiffs' Fourth Amendment claims concerning the August 18, 2009, seizure of their persons and on the merits for the plaintiffs' Fourteenth

Amendment equal protection claims;

- **DISMISSES without prejudice** the plaintiffs' Fourth Amendment claims of excessive force, unreasonable searches and unreasonable seizure of property;

- **DISMISSES with prejudice** the plaintiffs' Sixth Amendment claims for the failure to be informed of the nature and cause of the accusations against them;

- **DISMISSES with prejudice** Graham's claims against defendants Blair, Zywicki and Origliosso concerning the August 13, 2009, incident. Blair, Zywicki and Origliosso are terminated from this action; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The only claim remaining for trial is Graham's claim that Matevey violated her Fourth Amendment right not to be subject to an unreasonable seizure when he conducted the traffic stop on August 13, 2009.

**IT IS SO ORDERED.**
**DATED: December 28, 2011**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**